**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ATLANTIC SPECIALTY INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| BLACK BUTTE COAL COMPANY, | ) | |

### ATLANTIC'S COMPLAINT FOR INDEMNITY AND INJUNCTIVE RELIEF AGAINST BLACK BUTTE COAL COMPANY

Atlantic Specialty Insurance Company ("Atlantic"), by and through its undersigned counsel, files this Complaint against Black Butte Coal Company ("Black Butte" or "Indemnitor") and in support thereof states as follows:

**Nature of Complaint**

1.      In connection with Atlantic's potential liability to non-party Lighthouse Resources, Inc. ("Lighthouse") in an adversary proceeding currently pending in the United States Bankruptcy Court for the District of Delaware (Adv. Proc. No 24-50144), Atlantic asserts this action against the Indemnitor for exoneration and indemnification of any losses, costs, liabilities, and/or expenses Atlantic has incurred or may incur as a result of the adversary litigation – and this litigation – and liability that may be asserted in relation to Atlantic's issuance of certain reclamation bonds. Specifically, Atlantic seeks relief against the Indemnitor for breach of contract arising from its failure to comply with obligations owed to Atlantic pursuant to an Indemnity Agreement (as defined below) entered into between Atlantic and Indemnitor. Atlantic also seeks relief from the Indemnitor pursuant to Atlantic's common law rights of indemnity and further asserts causes of action for specific performance and injunctive relief.

1

**Parties and Relevant Persons**

2.    Plaintiff Atlantic is a New York corporation with its principal place of business in New York.

3.    Upon information and belief, Defendant Black Butte is a Utah partnership and joint venture owned 50% by KCP, Inc. ("KCP") and 50% by Bitter Creek Coal Company ("Bitter Creek"), which is a subsidiary of Anadarko Petroleum Corporation (a subsidiary of Occidental Petroleum). Black Butte operates an open cut surface mine in the Green River Basin, located in Sweetwater County, Wyoming.

4.    Upon information and belief, KCP is a Delaware Corporation with its principal place of business in South Jordan, Utah.

5.    Upon information and belief, Bitter Creek is a Utah corporation with its principal place of business in Midvale, Utah.

6.    Lighthouse Resources, Inc. ("Lighthouse") was a debtor in a Chapter 11 bankruptcy proceeding, Case No. 20-13056.  Lighthouse emerged from bankruptcy with a plan of reorganization.

7.    KCP is a subsidiary of Lighthouse and did not file for bankruptcy relief.

**Jurisdiction and Venue**

8.    This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. 1332(a), as Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000.00.

9.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Atlantic's issuance of Bonds (as hereinafter defined), administration of surety

obligations, and the making of collateral demands under the Indemnity Agreement (as hereinafter defined), which is governed by New York law, and Atlantic's claims set forth herein arise independent of any other rights and/or obligations set forth in the Operative Agreements (as hereinafter defined).

## Factual Background

10.     Atlantic is in the business of, among other things, providing surety bonds throughout the United States.

**A**.     **The Bonds and Indemnity Agreements**

11.     At the request of Indemnitor for surety credit and in reliance on a general indemnity agreement executed by, among others, Indemnitor, Atlantic issued surety bond no. 80004184 on behalf of Black Butte, as principal, with a penal sum of $15,000.00 ("Bond"). A true and correct copy of the Bond is attached hereto and included as **Group Exhibit A**.

12.     Additionally, Indemnitor, and other indemnitors that had executed the general indemnity agreement, including Lighthouse Resources, Inc. ("Lighthouse") and Decker Coal Company, LLC ("Decker Coal"), requested Atlantic extend surety credit through the issuance of other bonds on behalf of Decker Coal, as principal. Atlantic, as surety, issued among other bonds, reclamation bond nos. 800034462 (penal sum of $15,000,000) and 800010582 (penal sum of $15,000,000) on behalf of Decker Coal, as Principal, and for the benefit of the State of Montana and the United States of America, as Obligees, guaranteeing Decker Coal's performance obligations under Federal and local laws (the foregoing bonds issued on behalf of Decker Coal and the Bond, collectively referred to as the "Bonds").  A true and correct copy of the Bonds are attached hereto as **Group Exhibit A**.

13.    In consideration for Atlantic extending surety credit in the form of the Bonds, Atlantic required that Black Butte, and others, including Lighthouse and Decker Coal, to execute a general indemnity agreement which was referenced herein paragraphs 11 and 12 (the "Indemnity Agreement"). A redacted, true and correct copy of the Indemnity Agreement is attached hereto as **Exhibit B**.

14.    In executing the Indemnity Agreement, the Indemnitor agreed to, among other things, indemnity and save Atlantic harmless against all loss, cost, and expense which the Surety may pay or incur on account of any Bond issued at the request of the Indemnitor and/or enforcement of the Indemnity Agreement. The Indemnitor further agreed to, upon demand by Surety, post collateral security with Surety in the event Surety faces any liability in relation to the Bond. Specifically, the Indemnitor agreed to the following provisions:

> 2) Indemnity – the Indemnitors shall exonerate, hold harmless, indemnify, and keep indemnified the Surety from and against any and all liability for losses, fees, costs and expenses of any kind or nature, including but not limited to, court costs, attorney's fees, accounting and any other outside consulting fees and from and against any such losses and expenses which the Surety may sustain or incur, plus interest thereon, arising out of, directly or indirectly: 1) the Surety being requested by the Indemnitors to execute or procure the execution of any Bonds; or 2) the Surety having executed or procured the execution of any Bonds on behalf of the Principal; or 3) the failure of the Indemnitors to perform or comply with any of the terms and conditions of this Agreement and/or 4) the Surety enforcing any of the terms and conditions of this Agreement.

> 3) Collateral – The Indemnitors upon demand of the Surety, at any time and for any reason, including but not limited to Surety's receipt of a claim, shall deliver to the Surety collateral in the form and amounts acceptable to the Surety in its sole and absolute discretion. Any acceptable collateral provided to the Surety by the Indemnitors or any third party or the proceeds thereof, in whole or in part, may be held in the name of the Surety and applied to any obligations of Indemnitors under this Agreement. The Surety shall not have any obligation to release such collateral until it has received a written release and conclusive evidence of its discharge without loss in the form and substance satisfactory to the Surety with respect to the Bonds and fulfillment by Indemnitors of all obligations owed under this Agreement. Indemnitors agree that their failure to immediately deposit with

> Surety any sums demand under this section shall cause irreparable harm to Surety for which it has no adequate remedy at law, and Surety shall be entitled to injunctive relief for specific performance of such obligation.

*See* Ex. B at ¶¶ 2-3.

**B**.     **The Bankruptcy Plan, Bonding and Tolling Agreements, the Sinking Fund Agreement**

    **i.**     **The Plan**

15.     Certain Indemnitors, including Decker Coal and Lighthouse, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Court in the United States Bankruptcy Court for the District of Delaware on or about December 3, 2020.

16.     The Court confirmed Lighthouse's Bankruptcy Plan, as amended on or about March 10, 2021, Bankruptcy Docket No. 435 (the "Plan"). A true and correct copy of the Plan is attached hereto as **Exhibit C**.

17.     The Plan became effective on or about April 7, 2021 ("Effective Date") and provides for the creation of the Reclamation Trust Entity for the primary purpose of supervising the reclamation plans over a ten-year forecast period. *See generally* **Ex. C**.

18.     The Plan preserves Atlantic's indemnification rights against the indemnitors subject to certain limitations with respect to Black Butte. *See* **Ex. C** at Section K.

19.     Implicit in and as referenced in the Plan are various agreements that would be entered into among and between, Lighthouse and Atlantic, among others, in order to effectuate the purpose of the Plan.

20.     The Plan defines the following terms, in relevant part:

> 88.     *Reclamation*: means reclamation, remediation, revegetation, recontouring, abatement, restoration, mitigation, monitoring, water treatment, mine drainage, and control or prevention of adverse effects of mining activities required pursuant to any applicable law, including

SMCRA, the Montana Surface and Underground Mining Reclamation Act, licenses, leases, permits or the Clean Water Act.

. . .

91. _Reclamation Plans_: means the plans consistent with applicable non-bankruptcy law to fulfill the Debtors' obligations under SMCRA, CWA, the Montana Surface and Underground Mining Reclamation Act, or similar state law for the Reclamation, and approved by the applicable Reclamation Governmental Authorities (including without limitation, Montana), with respect to any property owned, leased used or impacted by (i) Coal Side Debtors Decker Holding Company, LLC, Decker Coal Company, LLC, and Montana Royalty Holdings, LLC in the course of their operations of the Decker Mine, or otherwise . . ..

. . .

94. _Reclamation Sinking Fund Benchmark_: means an amount of Cash sufficient to (i) cover the Reclamation Liabilities for completion of the Decker Reclamation Plan . . ..

. . .

96. _Reclamation Trust Entity_: means the trust or other legal Entity (as determined by the Debtors and the Consenting Stakeholders in their reasonable discretion in accordance with the terms of the Restructuring Support Agreement and Reclamation Trust Entity Agreement) established on the Effective Date to, among other things . . . (vi) oversee the completion of the Decker Reclamation Plan, and (vii) perform such other services as are contemplated by the Plan and the Reclamation Trust Entity Agreement, all as more fully described in Article IV.B.1 and 2.

_See_ **Ex. C**, Art. I.A.

21.    The Plan also defines the term "Decker Reclamation Plan" as, in relevant part, "the Reclamation Plan for the Decker Mine . . .," and defines the term "Decker Reclamation Budget" as, in relevant part, "the budget, which shall not be in excess of the Reclamation Sinking Fund Benchmark, for the completion of the Decker Reclamation Plan, which budget is approved by the Reclamation Trust Entity Board and the Sureties." _See_ **Ex. C**, Art. I.A.39-40.

22.     With regards to the Reclamation Trust Entity, the Plan provides that the Entity "shall be established to promote the interests of (i) the holders of the Reclamation Trust Entity Interests, (ii) the Sureties, and (iii) the Reclamation Governmental Authorities as otherwise contained in this Plan." *See* Ex. C, Art. IV.B.1. The Plan further states, in relevant part:

> The Powers, authority, responsibilities and duties of the Reclamation Trust Entity, the Reclamation Trust Entity Representative, and Reclamation Trust Entity Board are set forth in and shall be governed by the Plan, the Plan Supplement, and the Reclamation Trust Entity Agreement. The responsibilities and duties of the Reclamation Trust Entity shall include (i) overseeing the completion of the Decker Reclamation Plan as funded by the Reclamation Sinking Fund, with the use of such funds subject to the supervision of the Sureties, and by other funds, all as provided for the Reclamation Trust Entity Agreement . . . (iv) making or causing to be made distributions in accordance with the plan; (v) maintaining the Reclamation Sinking Fund; . . . and (ix) performing such other services as are contemplated by the Plan and the Reclamation Trust Entity Agreement or other services or activities as authorized by the Reclamation Trust Entity Board.
>
> . . .
>
> The Reclamation Sinking Fund is dedicated and to be used for Reclamation purposes in accordance with the Reclamation Plans, the Decker Reclamation Budget, and the Black Butte Reclamation Budget . . ..

*See* **Ex. C**, Art. IV.B.1.

23.     The Plan goes on to define the purpose of the Reclamation Trust Entity stating, in relevant part:

> (i) The Reclamation Trust Entity shall be established pursuant to the Reclamation Trust Entity Agreement for the purposes of overseeing the completing Reclamation Liabilities including the oversight of the Decker Reclamation Plan . . .and maintaining the Reclamation Sinking Fund.

*See* **Ex. C**, Art. IV.B.2.(i).

24.     The Plan also mandates that the Reclamation Trust Entity Board establish the Reclamation Trust Entity Budget and that "[a] preliminary form of such Reclamation Trust Entity

Budget shall be provided with the Plan Supplement in order to support confirmation of the Plan."

*See* **Ex. C**, Art. IV.B.8.

25. The Plan also provides that the Reorganized Debtors must comply with laws pertaining to various reclamation licenses and permits required to completion reclamation efforts contemplated in the Plan stating, in relevant part:

> Notwithstanding anything to the contrary in this Plan, the Debtors, Reorganized Debtors, and/or any assignee(s) or transferee(s) shall comply with all applicable bankruptcy and non-bankruptcy law, including any applicable statutes and regulations with respect to the Government Leases and Licenses or any permits or licenses issued under applicable state law related to Reclamation ("*State Law Permits*"), and nothing in this Plan shall otherwise affect, impair, release or extinguish the decommissioning, reclamation, and financial assurance obligations of the Debtors, Reorganized Debtors, and/or the assignee(s) or transferee(s), as applicable, under the Governmental Leases and Licenses or State Law Permits or any counterparts issued under applicable state law and under non-bankruptcy law, including any applicable federal and state statutes and regulations.

*See* **Ex. C**, Art. IV.I.

26. As contemplated in the Plan, a Summary Reclamation Budget was filed on August 31, 2021 as part of a Plan supplement with a ten-year forecast for the reclamation period ("Initial Budget"). A true and correct copy of the Initial Budget is attached hereto as **Exhibit D**.

27. The Initial Budget indicated Atlantic will have paid out all of its collateral by year four and be fully released from its two bonds on the East Decker Mines by 2025. *See* **Ex D**.

28. The Initial Budget also estimated that the costs to reclaim both the East and West Decker Mines would total $114,591,000. That amount was to be funded over ten years by both the Sureties and Black Butte through the Reclamation Sinking Fund.

29. In order to fund the reclamation of the two Decker Mines, the Plan provides for the creation of a segregated account under the custody and control of Reclamation Trust held on behalf of the Reorganized Coal Side Debtors.

8

30.     Thus, in summary and as it relates to the Plan alone, Lighthouse was charged with promoting the interests of, among others, Atlantic, overseeing the completion of the reclamation efforts at the Decker mines in accordance with the Operative Agreements (as defined herein), maintaining the Sinking Fund and budget for reclamation efforts at East Decker, and ensuring compliance with applicable state laws pertaining to the reclamation efforts including maintaining State Law Permits as applicable.

**ii.      The Trust Agreement**

31.     In accordance with the Plan, on or about April 7, 2021, Atlantic and certain other indemnitors, including Lighthouse, entered into the Reclamation Trust Entity and Distribution Agreement ("Trust Agreement") creating the Reclamation Trust for the primary purpose of supervising the reclamation plans and the overall Plan. A true and accurate copy of the Trust Agreement is attached hereto as **Exhibit E**.

32.     Specifically, as to the creation and purpose of the Lighthouse Reclamation Trust, the Trust Agreement states:

> The Beneficiaries and the Reclamation Trust Entity Representative hereby create the Lighthouse Reclamation Trust for the primary purpose of supervising the Reclamation Plans and in that process will, among other things: . . . (c) implement the Plan and make (or cause to be made) distributions in accordance with the Plan and the Agreement . . . (f) oversee (i) the completion of the Decker Reclamation Plan . . . (h) perform such other services as are contemplated by the Plan and this Agreement or other services or activities as authorized by the Reclamation Trust Entity Board, all as more fully described herein ("Purposes") . . ..

*See* **Ex. E**, Trust Agreement, § 1.1.

33.     The terms of the Trust Agreement provide that the Reclamation Trust Entity Representative ("Trust Representative") agreed to observe and perform the trust in accordance

with the terms of the Operative Agreement (as defined herein below) and promote the interests of,

among others, the Sureties (including Atlantic). *See* **Ex. E**, Trust Agreement, § 1.5.

34.     The Trust Representative is identified as Lighthouse. *See* **Ex. E**, Trust Agreement,

at Preamble.

35.     The Trust Agreement provides for the general powers, duties, obligations, rights

and benefits of the Trust Representative stating, in pertinent part, the following:

> . . . [T]he Reclamation Trust Entity Representative, upon direction by the
> Reclamation Trust Entity Board and in the exercise of their collective
> reasonable business judgment, in accordance with the terms and procedures
> set forth herein, shall, in an expeditious but orderly manner, carry out the
> Purposes for which Lighthouse Reclamation Trust has been created.

*See* **Ex. E**, Trust Agreement, § 2.2.

36.     To this end, The Trust Representative was prohibited from taking certain actions as

follows:

> . . . [T]he Trust Entity Representative shall not do or undertake any of the
> following:
>
> . . .
>
> e) Take or fail to take any action that would cause the Reclamation Trust
> Entity Budget or any portion thereof for any calendar year period to be
> exceeded except as authorized or approved in accordance with Section 3.3.
>
> f) Take or fail to take, any action that would cause the Reclamation Sinking
> Fund or any amount therein to be used for any purpose other than (i) funding
> the costs of overseeing and completing the Decker Reclamation Plan or
> other reclamation obligations as provided in the Reclamation Sinking Fund
> Agreement, (ii) funding the costs of the Black Butte Reclamation Plan
> attributable to Reorganized KCP's 50% interest in Black Butte, (iii) the
> payment of the Sinking Fund Management Fee, or (iv) payment of
> obligations of the Reorganized Coal Side Debtors under the Reclamation
> Trust Entity Bonding Agreement, including payment of annual surety fees
> to the Sureties, in each case at the times and in the amounts set forth in the
> Decker Reclamation Plan, the Black Butte Reclamation Plan, this
> Agreement, or the Reclamation Trust Entity Bonding Agreement,
> respectively, *provided, however*, that the limitation set forth in this

subsection shall apply only for so long as the Reclamation Plans have not been completed, as determined by the applicable Reclamation Governmental Authorities in accordance with applicable non-bankruptcy law, or any bonds securing reclamation of the Reorganized Coal Side Debtors or Black Butte remain outstanding.

*See* **Ex. E**, Trust Agreement, §2.3.

37.    The Trust Agreement further provides the following pertinent provisions indicating

that the purpose of the Trust Agreement is to aid in the implementation of the Plan:

> 12.3 **Cumulative Rights and Remedies**. The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.
>
> . . .
>
> 12.6 **Relationship to the Plan**. The principal Purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and, to the extent that the provisions of this Agreement are otherwise non-determinative, is subject to the provisions of the Plan and the Confirmation Order, which are attached hereto as Exhibit A and Exhibit B, respectively. If any provision of this Agreement is found to be inconsistent with a provision of the Plan or the Confirmation Order, the provisions of the Plan or the Confirmation Order, as applicable, shall control. If any provision of the Plan is found to be inconsistent with a provision of the Confirmation Order, the Confirmation Order shall control.
>
> . . .
>
> 12.14 **Integration**. This Agreement, the Reclamation Trust Entity Bonding Agreement, the Reclamation Sinking Fund Agreement, the Plan, and the Confirmation Order constitute the entire agreement with, by and among the parties thereto, and there are no representations, warranties, covenants, or obligations among them except as set forth herein, in the Plan and in the Confirmation Order. This Agreement, together with the Reclamation Plans, the Plan and the Confirmation Order, supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder. Except as otherwise provided in this Agreement, the Reclamation Trust Entity Bonding Agreement, the Reclamation Sinking Fund Agreement, the Plan or Confirmation Order, nothing herein is intended or shall be construed to confer upon or give any person other than (x) the parties hereto, (y) the Beneficiaries, and, (z), with respect to the

consent rights contained in Sections 1.7(a), 1.7(c) and 6.3(c), Bitter Creek or its successors or assigns, any rights or remedies under or by reason of this Agreement.

*See* **Ex. E**, Trust Agreement at §§ 12.3, 12.6, 12.14.

### iii.    The Sinking Fund Agreement

38.    In accordance with the Plan, Atlantic and certain other indemnitors, including Lighthouse, executed the Reclamation Sinking Fund Agreement (the "Sinking Fund Agreement") on April 7, 2021 which, generally, established a segregated account under the custody and control of Lighthouse and on behalf of the Reorganized Coal Side Debtors (as defined in the Plan and Trust Agreement) ("Reclamation Sinking Fund") to fund their reclamation obligations. A true and accurate copy of the Sinking Fund Agreement is attached hereto as **Exhibit F**. *See* **Ex. F**, Sinking Fund Agreement, at p. 1; *See also* **Ex. E**, Trust Agreement, at § 6.3(b).

39.    The Plan defines the "Reclamation Sinking Fund" and "Reclamation Sinking Fund Agreement" as follows:

> 92. *Reclamation Sinking Fund Agreement:* means the agreement among the Senior Secured Lenders, the Sureties, and the Reclamation Trust Entity Required by the terms of the Restructuring Support Agreement and Reclamation Trust Entity Agreement governing the holding and management of the Reclamation Sinking Fund.
>
> 93. *Reclamation Sinking Fund:* means Cash maintained in a segregated account by the Reclamation Trust Entity held on behalf of the Reorganized Debtors as security for their reclamation obligations as provided in the Restructuring Support Agreement and the Reclamation Trust Entity Agreement in an amount not to exceed the Reclamation Sinking Fund Benchmark that may be used by the Reclamation Entity Trust Representative to pay for the costs of performing and completing the Decker Reclamation Plan, reclamation expenditures under the Black Butte Reclamation Plan, payment of obligations under applicable indemnity agreements, and payment of annual fees to the Sureties, which fund will be comprised of (i) $56,344,000 (plus any interest earnings thereon, if any) in collateral held by the Sureties, other than Westchester, released to the Reclamation Sinking Fund after approval of the Decker Reclamation Plan as provided in the Reclamation Trust Entity Agreement, which amount shall

be exclusive of $1,000,000 in collateral to be retained by Zurich to secure the obligations it may have under that certain Indemnity Bond Given by Self-Insurer Under the Provisions of the Federal Coal Mine Health and Safety Act of 1969, as amended, Zurich bond No. 09093733 (the "Black Lung Bond"); (ii) $1,921,000 (plus any interest earnings thereon, if any) in collateral held by Westchester released to the Reclamation Sinking Fund after a 60% reduction of the penal sum of Westchester bond no. K08898339 by Montana after completion of phase I of the Decker Reclamation Plan for areas bonded by Westchester; (iii) contributions by KCP, Inc., of a percentage of net after-tax distributions to KCP, Inc. from Black Butte as provided in the Reclamation Trust Entity Agreement, and (iv) contributions by the applicable Reorganized Debtors of a percentage of Cash received from the sale of any of the Coal Side Debtors' Assets, with such contributions as provided in the Reclamation Trust Entity Agreement in a manner consistent with the terms of the Restructuring Support Agreement and the Reclamation Trust Entity Agreement.

*See* **Ex. C**, Art. I. A, ¶¶ 92-93.

40.     Pursuant to the Trust Agreement, Lighthouse is obligated to manage the Reclamation Sinking Fund in accordance with the Plan and the Reclamation Sinking Fund Agreement stating:

> b)     The Reclamation Sinking Fund shall be held **and managed by Lighthouse Reclamation Trust** in accordance with the Reclamation Trust Entity Budget and that certain Reclamation Sinking Fund Agreement entered into contemporaneously herewith by and among the Senior Secured Lenders, the Sureties and Lighthouse Reclamation Trust held on behalf of the Reorganized Coal Side Debtors to fund their reclamation obligations ("Reclamation Sinking Fund Agreement"), **for (i) the management and implementation of the Decker Reclamation Plan**, (ii) funding Reorganized KCP's share of obligations related to the Black Butte Reclamation Plan (iii) payment of the Sinking Fund Management Fee to Reorganized LHR Coal, and (iv) payment of obligations of Reorganized Coal Side Debtors under the Reclamation Trust Entity Bonding Agreement, including payment of annual surety premiums and reimbursement of fees to the Sureties.

*See* **Ex. E**, Trust Agreement at § 6.3(b) (bold and underlined emphasis added).

41.     Further, similar to the Trust Agreement, the Sinking Fund Agreement provides the following pertinent provisions indicating that the purpose of the Sinking Fund Agreement is to aid in the implementation of the Plan:

> 5.3 **Cumulative Rights and Remedies**. The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and the Confirmation Order.
>
> 5.4 **Relationship to the Plan**. The principal Purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and, to the extent that the provisions of this Agreement are otherwise non-determinative, is subject to the provisions of the Plan and the Confirmation Order, which are attached hereto as Exhibit A and Exhibit B, respectively to the Reclamation Trust Agreement. If any provision of this Agreement is found to be inconsistent with a provision of the Plan or the Confirmation Order, the provisions of the Plan or the Confirmation Order, as applicable, shall control. If any provision of the Plan is found to be inconsistent with a provision of the Confirmation Order, the Confirmation Order shall control.
>
> . . .
>
> 5.11 **Integration**. This Agreement, the Reclamation Trust Entity Bonding Agreement, the Reclamation Trust Agreement, the Plan, and the Confirmation Order constitute the entire agreement with, by and among the parties thereto, and there are no representations, warranties, covenants, or obligations among them except as set forth herein, in the Plan and in the Confirmation Order.  This Agreement, together with the Reclamation Plans, the Plan and the Confirmation Order, supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  Except as otherwise provided in this Agreement, the Reclamation Trust Entity Bonding Agreement, the Reclamation Trust Agreement, the Plan or Confirmation Order, nothing herein is intended or shall be construed to confer upon or give any person other than the parties hereto any rights or remedies under or by reason of this Agreement.

*See* **Ex. F**, Sinking Fund Agreement at §§ 5.3-5.4, 5.11.

42.     Accordingly, as set forth in the Operative Agreements including the Plan and Trust Agreement, Lighthouse was charged with managing the Sinking Fund Agreement for, among other

things, the implementation of the Decker Reclamation Plan, which per the definitions set forth in the Plan, includes plans which must be consistent with applicable non-bankruptcy law to fulfill reclamation efforts at the Decker Mine. *See* **Ex. C**, Art. I.A, Definitions at ¶¶ 40, 88, and 91.

### iv.     The Bonding Agreement

43.     In accordance with the Plan, Atlantic and Lighthouse, among others, executed the Reclamation Trust Entity Bonding Agreement (the "Bonding Agreement"). A true and accurate copy of the Bonding Agreement is attached hereto as **Exhibit G** (the Plan, Trust Agreement, Sinking Fund Agreement, Bonding Agreement, and Tolling Agreement (as defined herein) including any and all supplements to the foregoing, as well as documents incorporated into and attached to the foregoing, are hereinafter collectively referred to as the "Operative Agreements").

44.     The Bonding Agreement provides an assumption by the Reorganized Coal Side Debtors of the relevant indemnity agreement stating, in relevant part:

> 1.2 **Assumption of Existing Indemnity  Agreements**. The parties acknowledge that the Existing Indemnity Agreements have been assumed by the Reorganized Coal Side Debtors pursuant to the Plan and Confirmation Order.  All terms, covenants and conditions set forth in the Existing Indemnity Agreements (a) remain valid, effective and in full force and effect, (b) are hereby ratified and affirmed, and (c) continue unimpaired under the Plan with respect to the Reorganized Coal Side Debtors. If any provision of this Agreement is found to be inconsistent with a provision of the Existing Indemnity Agreements, except as set forth in Article II, the provisions of the Existing Indemnity Agreements shall control subject only to the provisions for forbearance of the Sureties' enforcement of the Existing Indemnity Agreements as set forth herein.

*See* **Ex. G**, Bonding Agreement at § 1.2.

45.     Under the Bonding Agreement, the parties acknowledge and amend, in accordance with the terms therein, the existing indemnity agreements entered into between the Reorganized Coal Side Debtors (as defined therein), Black Butte, and the Sureties. The limitations regarding Black Butte are detailed in Section 1.3 as follows:

> 1.3 Black Butte. All rights of the Sureties under the Existing Indemnity Agreements are preserved, unimpaired and unmodified; provided, however, that each of the Sureties agrees that it will forbear from pursuing any such rights under the Existing Indemnity Agreements, as applicable, against Black Butte unless and until (a) there is a material default, **including either an actual or an anticipatory default, to be determined in the reasonable, good faith discretion of the Sureties or a default under the Plan or other Definitive Documents**, or (b) Black Butte does not agree to execute a tolling agreement with the Sureties tolling all applicable statutes of limitation.

*See* **Ex. G** at Section 1.3 (emphasis added).

46.      The Bonding Agreement further sets forth certain indemnification obligations in relation to the Reorganized Coal Side Debtors stating:

> 1.5 **Indemnification**. Except with respect to costs and expenses set forth in Section 4.3, and in addition to any obligations under the Existing Indemnity Agreements, the Reorganized Coal Side Debtors agree, on a joint and several basis, to indemnify each of the Sureties from and against any and all liability, loss, costs, damages, attorneys' fees and expenses, of whatever kind or nature, hereafter sustained or incurred by such Surety by reason, or in consequence of such Surety executing the Bond or Bonds as surety or co-surety, or procuring the execution thereof, in making any investigation on account of any such Bond or Bonds, in defending or prosecuting any action, suit or other proceeding which may be brought in connection therewith, in enforcing any of the agreements herein contained, and in obtaining a release from liability under any such Bond or Bonds; and to indemnify such Surety to the full amount of liability, loss, costs, damages, attorney's fees and expenses as aforesaid, regardless of any reinsurance that may be carried on any such Bonds.  The Sureties agree to forbear from enforcing the indemnity obligations of the Reorganized Coal Side Debtors under this Agreement and, as applicable, under the Existing Indemnity Agreements unless and until (a) there is a material  default, including either an actual or an anticipatory default, **to be determined in the reasonable, good faith discretion of the Sureties or a default under the Plan or other Definitive Documents.**  To the extent any of the Reorganized Coal Side Debtors is not a signatory to any of the Existing Indemnity Agreements, the entry of such Reorganized Coal Side Debtors into this Agreement shall constitute a valid and binding agreement of such Reorganized Coal Side Debtors to be bound by and perform under each of the Existing Indemnity Agreements.

*See* **Ex. G**, Bonding Agreement at § 1.5 (bold and underlined emphasis added).

47.    Similar to both the Trust Agreement and the Sinking Fund Agreement, the Bonding

Agreement contains the following pertinent provisions indicating that the purpose of the Bonding

Agreement is to aid in the implementation of the Plan:

> 5.3 **Cumulative Rights and Remedies**. The rights and remedies provided in this Agreement are cumulative and are not exclusive of any rights under law or in equity, subject to any limitations provided under the Plan and Section 4.2.

> 5.4 **Relationship to the Plan**. The principal purpose of this Agreement is to aid in the implementation of the Plan and, therefore, this Agreement incorporates and, to the extent that the provisions of this Agreement are otherwise non-determinative, is subject to the provisions of the Plan and the Confirmation Order, which are attached as Exhibit A and Exhibit B, respectively, to the Reclamation Trust Agreement.  If any provision of this Agreement is found to be inconsistent with a provision of the Plan or the Confirmation Order, the provisions of the Plan or the Confirmation Order, as applicable, shall control.  If any provision of the Plan is found to be inconsistent with a provision of the Confirmation Order, the Confirmation Order shall control.

> . . .

> 5.11 **Integration**. The Existing Indemnity Agreements, as amended by this Agreement, the Reclamation Trust Agreement, the Reclamation Sinking Fund Agreement, the Plan, and the Confirmation Order constitute the entire agreement with, by and among the parties thereto, and there are no representations, warranties, covenants, or obligations among them except as set forth herein, in the Plan and in the Confirmation Order.  The Existing Indemnity Agreements, as amended by this Agreement, together with the Reclamation Plans, the Plan and the Confirmation Order, supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, written or oral, of the parties hereto, relating to any transaction contemplated hereunder.  Except as otherwise provided in the Existing Indemnity Agreements, as amended by this Agreement, the Reclamation Trust Agreement, the Reclamation Sinking Fund Agreement, the Plan or Confirmation Order, nothing herein is intended or shall be construed to confer upon or give any person other than the parties hereto any rights or remedies under or by reason of this Agreement.

*See* **Ex. G**, Bonding Agreement at §§ 5.3-5.4, 5.11.

**C.**    **OBLIGATIONS UNDER THE OPERATIVE AGREEMENTS**

48.    The purpose of the Operative Agreements is to contractually bind Lighthouse to Atlantic, among others, in order for Lighthouse to successfully implement the Decker Reclamation Plan and ultimately fulfill the reclamation as required by the Bonds.

49.    The Trust Agreement expressly provides that Lighthouse shall supervise the reclamation plans and, in that process, will, *inter alia*, implement the bankruptcy reorganization Plan, oversee the **completion of the Decker reclamation plan** and oversee the Reclamation Sinking Fund with use of such funds subject to the supervision of the sureties. *See* **Ex. F** at Section 1.1 (emphasis added).

50.    Pursuant to the Operative Agreements, Lighthouse must hold and manage the Reclamation Sinking Fund in accordance with the terms of the Sinking Fund Agreement and for the purpose of the management and implementation of reclamation plans including the East Decker reclamation plans. *See* **Ex. F** at Section 6.3(b).

51.    Lighthouse must also ensure that the use of funds in the Reclamation Sinking Fund are subject to the supervision of Atlantic and the other sureties. *See* **Ex. E** at § 1.1.

52.    The Sinking Fund Agreement and Trust Fund Agreement require the Reclamation Sinking Fund to be funded by **two** sources: a) releases of collateral held by the sureties **and** b) a portion of profits *from Black Butte*. *See* **Ex. C** at §§ 2.2, 2.3; *See* **Ex. E** at Section 6.3.

53.    To date, Atlantic has released in excess of $10 million in collateral to the Reclamation Sinking Fund as required by Atlantic under the plan.

54.    Black Butte's indemnity obligations are inextricably linked to Lighthouse's management and success on the East Decker reclamation project, and any default by Lighthouse

impacts Black Butte's indemnity obligations to Atlantic. Specifically, Black Butte is jointly and severally responsible for the obligations of all indemnitors identified in the Indemnity Agreement.

55.      The reclamation of the East Decker mine did not progress as detailed by Lighthouse at least in part due to Black Butte's failure to provide adequate funding to the Reclamation Sinking Fund.

**D.      LIGHTHOUSE'S DEFAULTS**

     **i**.      **Bankruptcy Plan and Initial Budget Variances**

56.      Lighthouse knowingly emerged from bankruptcy three years ago with a Plan that did not include over $9.3 million in necessary costs to achieve the approved reclamation plans therein. *See* **Ex. C** as compared to the Plan variance explanation provided by Lighthouse to Atlantic, a true and correct copy of which is attached hereto as **Exhibit H**.

57.      As seen in the Plan variance provided by Lighthouse, starting in 2021, the following costs were not included in the Plan but should have been:

| Year(s) | Description | Amount |
|---|---|---|
| **2021** | 2020 Big Horn County property taxes assumed in bankruptcy, not included in plan | $  889,000 |
| | 2021 Decker property taxes not included in plan | 676,000 |
| | Black Lung annual payments (estimated) | 84,000 |
| | Bond forfeiture | 900,000 |
| **2022** | 2022 Decker property taxes not included in plan | 753,000 |
| | 2 Black lung cases settled in 2022 not included in plan | 235,000 |
| | 2021 STIP not included in plan | 220,000 |
| | Black Lung annual payments (estimated) | 84,000 |
| **2023** | 2023 Decker property taxes not included in plan | 592,000 |
| | 2022 STIP not included in the plan | 342,000 |
| | Black Lung annual payments | 84,000 |
| **2021-2023** | Total Repairs over the last 3 years not included in plan | 4,500,000 |
| | Subtotal: | $   9,359,000 |

58.      Lighthouse knowingly did not disclose and include over $9.3 million in its Plan, emerged from bankruptcy knowingly underfunded, spent beyond its planned budget for the past three years, and failed to share these Plan variances with Atlantic until 2024.

59.     Lighthouse expended funds received by way of the Sinking Fund Agreement from, among others, Atlantic, and did not use the funds in accordance with the Operative Agreements including, but not limited to the § 6.3(b) of the Trust Agreement at § 6.3(b) and Art. IV(B)(1) of the Plan. *See* **Ex. E** at §6.3; **Ex. C**, Art IV(B)(1).

60.     Additionally, Lighthouse's Initial Budget, presented with its original, underfunded Plan, set forth that Atlantic would have paid out all of its collateral by year four and that the East Decker reclamation would be complete and with a full release of Atlantic under its Bonds by 2025. *See* **Ex. D**.

61.     Lighthouse requested collateral releases from Atlantic to fund the East Decker reclamation efforts while knowing that the plans faced a shortfall of at least $9.3 million from inception.

62.     Atlantic detrimentally relied on Black Butte's representations that it would commit adequate funding to Lighthouse when required when Atlantic entered the various governing agreements and agreed to release its collateral pursuant to the terms therein.

63.     In reliance of Lighthouse's representations in its Plan and Initial Budget and Black Butte's representations regarding the funding it would commit, Atlantic expected to have paid out all of its collateral by year four and that the East Decker reclamation and full release of Atlantic under its bonds would take place in 2025.

64.     In other words, Atlantic's liability should have been fully discharged as of the date of this filing.

65.     Despite the Plan and Initial Budget incorporated therein, on which Atlantic detrimentally relied upon, the actual reclamation of East Decker is seven years behind schedule and with the need of multi-millions of dollars to complete the reclamation.

66.     Lighthouse withheld the variances in its bankruptcy Plan and the severity of its budget shortfalls from Atlantic until beginning of 2024.

**ii**.     **Lighthouse's Lack of Progress**

67.     According to the Plan and Initial Budget, Lighthouse should have achieved or reclaimed 67% of the East Decker Mine by 2024.

68.     Lighthouse has failed to reclaim 67% of the East Decker Mine and is now seven years behind on its East Decker reclamation plan despite Atlantic already releasing 60 percent of its collateral consistent with its obligations under the Plan and governing agreements.

69.     Lighthouse's reclamation efforts have suffered because, according to Lighthouse, $9.3 million in costs were not included in the Plan when they should have been, and significant funding has not been provided by Black Butte for the past three years. *See* **Ex. D**.

**iii**.     **Budgeting Deficiencies**

70.     Lighthouse has made little progress on its reclamation plans due to years of significant funding and productivity issues, issues that have been exacerbated by Black Butte's failure to fund the Reclamation Sinking Fund in any manner.

71.     Lighthouse has failed to adequately supervise the reclamation plans in accordance with the Plan and Operative Agreements as evidenced by the significant budget shortfalls in the Reclamation Sinking Fund.

72.     Consequently, the Plan was  not feasible from the start and now the costs to complete the reclamation far exceed what Lighthouse initially budgeted for.

73.     Black Butte has also failed to provide the necessary funding to Lighthouse as set forth in the Reclamation Sinking Fund Agreement.

iv.    **Non-Compliance with Law – Action Initiated by Montana DEQ**

74.    Permits for Lighthouse's and Decker Coal's reclamation at the East Decker Mine are required under the Montana Strip and Underground Mine Reclamation Act, which further requires reclamation plans in accordance with Montana law. *See generally* MCA § 82-4-201, *et seq*.

75.    MCA § 82-4-251(2) provides:

> (2) When, on the basis of an inspection, the department determines that any permittee is in violation of any requirement of this part or any permit condition required by this part that does not create an imminent danger to the health or safety of the public or cannot be reasonably expected to cause significant and imminent environmental harm to land, air, or water resources, the director or an authorized representative shall issue a notice to the permittee or the permittee's agent fixing a reasonable time, not exceeding 90 days, for the abatement of the violation and providing opportunity for public hearing. If, upon expiration of the period of time as originally fixed or subsequently extended, for good cause shown and upon the written finding of the director or an authorized representative, the director or an authorized representative finds that the violation has not been abated, the director or an authorized representative shall immediately order a cessation of the operation or the portion of the operation relevant to the violation. The cessation order remains in effect until the director or an authorized representative determines that the violation has been abated or until modified, vacated, or terminated by the director or an authorized representative pursuant to subsection (6). In the order of cessation issued under this subsection, the director shall determine the steps necessary to abate the violation in the most expeditious manner possible and shall include the necessary measures in the order.

*See* MCA § 82-4-251(2).

76.    On or about January 29, 2025, the Montana Department of Environmental Quality ("DEQ") issued a "Notice of Noncompliance and Order of Abatement" to Lighthouse (the "Notice of Noncompliance") in relation to Permit ID No. C1983007 and the reclamation at the East Decker Mine. A true and correct copy of the Notice of Noncompliance is attached hereto as **Exhibit I**.

77.    The Notice of Noncompliance states the following, in pertinent part:

During a Department of Environmental Quality (DEQ) complete inspection of the East Decker Mine (Permit #C1983007) on December 19, 2024, DEQ documented that permit reclamation commitments for 2024 were not completed.

**Nature of the Violation: Failure to Comply with the Approved Reclamation Plan**

The Administrative Rules of Montana (ARM) 17.24.501(6)(b) states that, unless otherwise approved by DEQ, backfilling and grading must be completed within two years after coal removal from each pit has been concluded. Attachment 313-1b (Exhibit 1) of the permit lists a general timeline of reclamation. In 2024, the East Decker Mine commitment was for 3 million cubic yards of material to be moved with a truck and shovel fleet. One hundred acres were also supposed to be seeded. DEQ conducted thirteen inspections in 2024, and DEQ recorded that the truck and shovel fleet was never activated and that no soil laydown or seeding had occurred in 2024. Decker Coal Company's (DCC) alternate reclamation schedule was approved in 2021 and revised in 2022. While Attachment 313-1b states that the schedule may be subject to change, ARM 17.24.313(1)(b) requires any changes to a reclamation plan to be approved by DEQ prior to implementation.  No such approved changes were made.

*See* **Ex. I**, Notice of Noncompliance at p. 1.

78.     Subsequent to the Notice of Noncompliance, Decker Coal Company filed a Motion to Suspend Abatement Requirements with the DEQ Board of Environmental Review (the "DEQ Board") requesting suspension of the abatement requirements in the Notice of Noncompliance.

79.     A hearing on Decker Coal Company's motion took place on or about April 25, 2025 and on May 7, 2025, the chair of the DEQ Board issued an Order Denying Suspension of Abatement – in other words, Decker Coal's motion was rejected by the DEQ Board.

80.     On June 20, 2025, the Board issued a stay in the matter before it regarding Decker Coal's reclamation plan in connection with Permit C1983007 until the December 2025 Board meeting.

81.     Subsequently, on or about August 28, 2025, the DEQ issued, in relevant part, a Notice of Violation ("Notice of Violation") to Decker Coal which stated, among other things, that

(1) the Notice of Noncompliance "related to a failure to follow the approved reclamation plan," and that (2) "[w]ith this letter, DEQ is notifying [Decker Coal] of its issuance of a [Notice of Violation] in accordance with the Administrative Rules of Montana (ARM) 17.24.1211. After issuance of a [Notice of Noncompliance ("NON")] and evaluating the circumstances of the violation, DEQ has determined that the NON was appropriate and that a vacatur of that NON is not warranted." A true and correct copy of the Notice of Violation is attached hereto as **Exhibit J**.

82.     In light of the foregoing Notice of Violation as well as the DEQ's termination of abatement order also issued on or about August 28, 2025, Decker Coal requested dismissal of the DEQ Proceedings. Upon information and belief, the DEQ Board granted the dismissal request on or about October 24, 2025.

83.     Accordingly, based on the DEQ's Notice of Noncompliance and the reasons set forth in DEQ's Notice of Violation, Lighthouse's/Decker Coal's reclamation efforts and plan on the East Decker Mine were considered a violation of applicable Montana law.

84.     Upon information and belief, Lighthouse's/Decker Coal's failure to comply with applicable Montana law began in, at the latest, 2024.

85.     Thus, in summary, the DEQ Notice of Noncompliance and Notice of Violation constitutes Decker Coal and Lighthouse being in default under applicable law which satisfies that there be a "Default under the Plan or Definitive Documents" as set forth in Sections 1.3 and 1.5 of the Bonding Agreement.

E.     **Termination of Tolling Agreement and Atlantic's Right to Enforce the Indemnity Agreement**

86.     In an effort to protect itself from squandering money and increasing its losses arising out of Lighthouse's failed Plan and unrealistic forecast, Atlantic exercised its contractual right under the Tolling Agreement, a true and correct copy of said Tolling Agreement being

attached hereto as **Exhibit K**, to issue a 60-day notice of termination on July 29, 2024. *See* a true and correct copy of the Notice of Termination attached hereto as **Exhibit L**.

87.    The Tolling Agreement permits termination by any party upon 60 days written notice to all other parties. *See* **Ex. K** at ¶ 8.

88.    The Tolling Agreement therefore terminated on September 27, 2024. The suit limitation period set forth in the agreement is no longer tolled, and Atlantic may exercise its right to demand indemnity, collateral, exoneration and/or reimbursement from Black Butte pursuant to the Indemnity Agreement.

89.    Atlantic may also enforce its indemnity rights against Black Butte and the Reorganized Coal Side Debtor Indemnitors (which includes reorganized Lighthouse and Decker Coal) under Sections 1.3 and 1.5 of the Bonding Agreement. *See* **Ex. G**, Bonding Agreement, §§ 1.3, 1.5.

90.    Section 1.3 of the Bonding Agreement provides that all of Atlantic's rights under the relevant indemnity agreements are "preserved, unimpaired and unmodified; provided however, that each of the Sureties agrees that it will forbear from pursuing any such rights under the Existing Indemnity Agreements, as applicable, against Black Butte unless and until (a) there is a material default, including either an actual or anticipatory default to be determined in the reasonable, good faith discretion of the Sureties or a default under the Plan or Definitive Documents." *See* **Ex. G**, Bonding Agreement at § 1.3.

91.    Section 1.5 of the Bonding Agreement provides, in relevant part, that the "Sureties agree to forbear from enforcing indemnity obligations of the Reorganized Coal Side Debtors under this Agreement, and as applicable, under the Existing Indemnity Agreements unless and until (a) there is a material default, including either an actual or an anticipatory default, to be determined

in the reasonable, good faith discretion of the Sureties or a default under the Plan or other Definitive Documents." *See* **Ex. G**, Bonding Agreement at § 1.3.

92.    On July 31, 2024, presumably in response to Atlantic's Notice of Termination, Lighthouse (in its capacity as Trustee) demanded Atlantic release its Pro-Rata Share of the collateral pursuant to the Sinking Fund Agreement, but, on information and belief, did not request a contribution from Black Butte.

93.    Consistent with all prior communications to Lighthouse since January of 2024, Atlantic responded to Lighthouse on August 13, 2024 and advised that Atlantic has the right to withhold collateral due to the material breaches parties to the governing agreements, which includes Lighthouse's own failures to properly supervise and oversee the Reclamation Sinking Fund.  A true and correct copy of Atlantic's August 13, 2024 Response is attached hereto as **Exhibit M**.

94.    Lighthouse has materially defaulted under the Operative Agreements by failing to adequately make progress on its reclamation efforts in accordance with the Plan and terms of the Operative Agreements.

95.    Specifically, Lighthouse's breaches trigger Atlantic's rights to enforce indemnity obligations including stopping collateral payments to the Reclamation Sinking Fund *and* Atlantic's right to seek additional collateral from any of the indemnitors, including Black Butte in accordance with the Indemnity Agreement. *See* **Ex. C** at ¶¶ 2-3.

96.    Atlantic has already sustained losses in connection with issuing the Bonds and faces additional loss with each year that Lighthouse continues to fall behind in its reclamation efforts.

97.    Lighthouse will not succeed in its reclamation efforts of the East Decker mine due to its significant lack of funding as a result of its failed Plan and lack of progress on said Plan.

98.    The DEQ inquiry into Lighthouse's management of the East Decker mine reclamation is further evidence of Lighthouse's default: it has not effectively managed the project, and the DEQ's Notice of Noncompliance references Lighthouse's a failure to follow *its own* plan, at least in part due to Black Butte's failure to adequately fund the reclamation efforts from its profits as set forth in the Operative Agreements. This Notice of Noncompliance in conjunction with the Notice of Violation demonstrates a failure by Lighthouse and/or Decker Coal to comply with applicable laws and regulations pertaining to its reclamation efforts.

99.    Lighthouse's inability to complete its reclamation efforts constitutes an anticipatory breach of its obligations under the Trust Agreement. *See* **Ex. E** at Sections 1.1 and 6.3.

100.    Moreover, as set forth above, the DEQ's Notice of Noncompliance and Notice of Violation supports a finding that Lighthouse is in breach of the Operative Agreements by way of failing to comply with applicable law.

101.    According to the Plan (which is incorporated into the Operative Agreements), Lighthouse was required to oversee the Decker Reclamation Plan. This includes ensuring that the reclamation efforts comply with state law for Reclamation and approved by the applicable Reclamation Governmental Authorities, including Montana. *See* **Ex. C** at ¶ 91.

102.    Lighthouse has since proceeded to reopen its Chapter 11 case and file an adversary proceeding against Atlantic seeking funding from Atlantic only.

103.    Lighthouse has provided Atlantic with a revised reclamation plan, and the revised plan would require an additional $32.5 million for completion of the project, presuming Lighthouse meets all production targets moving forward.

104.    Lighthouse has not indicated how it will secure the additional $32.5 million to effectuate its revised reclamation plan.

105.    Atlantic is currently holding $6 million in collateral and faces a total penal sum exposure of $30 million  in addition to its costs and fees incurred in relation to the Bonds.

106.    Due to the mismanagement by Lighthouse and the accompanying lack of funding along with the DEQ's Notice of Noncompliance (followed by the DEQ's Notice of Violation) demonstrating an unequivocal failure by Lighthouse/Decker Coal to comply with applicable law, Atlantic requested collateral from Black Butte as set forth in further detail below.

F.    **<u>Atlantic's Collateral Demand and Prior Proceedings</u>**

107.    On or about October 31, 2024, and pursuant to its rights under the Indemnity Agreement, Atlantic sent Black Butte an "Indemnity Request" relating to the Bond, demanding the advancement of funds as collateral to Atlantic in the amount of $24 million by the close of business on November 7, 2024 (the "Demand Letter"). A true and correct copy of the Demand Letter is attached hereto as **<u>Exhibit N</u>**.

108.    The amount of collateral requested in the Demand Letter related solely to addressing the $30 million penal sum exposure faced by Atlantic. The requested amount expressly did not address any attorneys' and consulting fees that Atlantic has and will incur in addressing claims in relation to the Bond and/or enforcement of the Indemnity Agreement.

109.    Black Butte did not advance any funds whatsoever to Atlantic in response to the Demand Letter as it was obligated to do under the terms of the Indemnity Agreement.

110.    Accordingly, on November 13, 2024, Atlantic filed a Third-Party Complaint in the above-referenced adversary proceedings against Black Butte based on information and facts known to Atlantic at the time of said filing. A true and correct copy of Atlantic's Third-Party Complaint is attached hereto as **<u>Exhibit O</u>**.

111.    Specifically, while Atlantic believed there had been a breach and/or anticipatory breach under the Operative Agreements by Lighthouse which triggered Atlantic's ability to seek collateral from Black Butte as of the filing of the Third-Party Complaint, the Montana DEQ had yet to issue its Notice of Noncompliance and Notice of Violation which expressly noted noncompliance with applicable law. As such, the aforementioned allegations relating to Lighthouse's and Decker Coal's failure to comply with applicable law as a basis for Atlantic's claim against Black Butte were not a part of the allegations set forth in the Third-Party Complaint.

112.    Black Butte subsequently moved to dismiss Atlantic's Third-Party Complaint. The Court provided its ruling granting the motion to dismiss on July 1, 2025. A true and correct copy of the Transcript from the July 1, 2025 bench ruling is attached hereto as **Exhibit P**. The Court issued a subsequent order reflecting its bench ruling on July 22, 2025. A true and correct copy of the July 22, 2025 Order is attached hereto as **Exhibit Q**.

113.    Notably, the Court's July 1, 2025 bench ruling and subsequent order addressed Atlantic's Third-Party Complaint which was filed prior to the issuance of the DEQ Notice of Noncompliance and Notice of Violation and did not consider the new and contractual grounds asserted herein, including Lighthouse's and Decker Coal's violation of state reclamation laws which is a default under the Operative Agreements.

114.    The allegations and claims relating to Lighthouse's and Decker Coal's failure to comply with applicable law constituting a breach under the Operative Agreements, in Atlantic's discretion (as provided under Section 1.3 and 1.5 of the Bonding Agreement), were not at issue in the briefs, arguments, and eventual ruling on Black Butte's Motion to Dismiss Atlantic's Third-Party Complaint.

115.    Accordingly, on October 29, 2025, Atlantic issued another Collateral Demand to Black Butte noting, among other things, the DEQ's Notice of Noncompliance and requesting $25,125,000 in collateral on or before November 5, 2025 (the "Renewed Demand").  A true and correct copy of the October 29, 2025 Renewed Demand is attached hereto as **Exhibit R**.

116.    The Renewed Demand further noted that Section 1.3 of the Bonding Agreement provides Atlantic with discretion to determined whether there is a default under the Operative Agreements or Plan, that the DEQ Notice of Non-Compliance and evidence of a failure to follow applicable law constitutes a default under the Operative Agreements, and that it may incur potential loss, in full (a full penal sum loss), under the Bonds. *See* **Ex. R**.

117.    The Renewed Demand concluded with its collateral request in the amount of $25,125,000 and stated that "[t]he requested amount does not address, in full, attorneys' and consulting fees that Atlantic has incurred and will continue to incur to address any claims in relation to the Bond, enforcement of the Indemnity Agreement, and/or other liability associated with Lighthouse and the Decker Mines." *Id*.

118.    On November 5, 2025, Black Butte, through counsel, responded to the Renewed Demand rejecting Atlantic's demand and making various accusatory and contrived accusations as to Atlantic's position along with a threat of sanctions, while ignoring Atlantic's merited position and good-faith demand pursuant to Atlantic's rights under the Operative Agreements. A true and correct copy of Black Butte's November 5, 2025 correspondence to Atlantic is attached hereto as **Exhibit S**.

119.    Accordingly, Atlantic takes Black Butte's November 5, 2025 correspondence "rejecting" the Renewed Demand as further support of Black Butte's intent to disregard its

obligations under the Indemnity Agreement given Black Butte's failure to provide the requested collateral to Atlantic.

120.    Atlantic will continue to incur additional costs and expenses for which it is entitled to reimbursement throughout the litigation of this matter and to obtain reimbursement and collateral from the Indemnitor, as well as because of Lighthouse's ongoing mismanage of the reclamation project.

**COUNT I**
**<u>Breach of Contract</u>**

121.    Atlantic adopts, incorporates, and re-alleges paragraphs 1 through 120 above as though fully set forth as paragraph 121 of this Count I of Atlantic's Complaint.

122.    The Indemnity Agreement is a binding and enforceable contract.

123.    The Indemnitor is, jointly and severally, obligated to indemnify and reimburse Atlantic from any and all costs and expenses Atlantic incurs as a consequence of issuing the Bonds and enforcing the terms of the Indemnity Agreement.  *See* **<u>Ex. B</u>** at ¶¶ 2-3.

124.    Further, the Indemnitor agreed, jointly and severally with all other indemnitors including Decker Coal, to become and is obligated, upon demand from Atlantic, to advance collateral funds to Atlantic "in the form and amounts acceptable to the Surety in its sole and absolute discretion. Any acceptable collateral provided to the Surety by the Indemnitors or any third party or the proceeds thereof, in whole or in part, may be held in the name of the Surety and applied to any obligations of Indemnitors under this Agreement." *See* **<u>Ex. B</u>** at ¶ 3.

125.    To date, the Indemnitor has failed to indemnify, reimburse and hold Atlantic harmless from and against any loss or damages it may suffer including, but not limited to, losses and expenditures relating to the total penal sum exposure of $30 million.

126.    To date, the Indemnitor has failed to provide collateral, as it is jointly and severally obligated to do, in an amount and form acceptable to Atlantic in compliance with paragraph 3 of the Indemnity Agreement.

127.    Despite Atlantic's reasonable indemnity request through its Renewed Demand, the Indemnitor has materially breached the Indemnity Agreement by failing and refusing to indemnify and reimburse Atlantic for the losses it has incurred as a consequence of having issued the Bonds and provide collateral Atlantic requested.

128.    Atlantic has fully performed its obligations under the Indemnity Agreement.

129.    The Indemnitor's material breach has and will continue to damage Atlantic.

130.    Atlantic has been damaged by the Indemnitor's material breach of the executed Indemnity Agreement in the initial amount of the collateral not posted and the attorneys' and consulting fees and expenses it continues to incur to-date.

131.    Further, to the extent Atlantic is required to make additional payments on account of any claims made under the Bonds or incur additional loss related to Lighthouse's continued failures executing its reclamation plans including, but not limited to, losses arising out of Decker Coal's acts and/or omissions, Atlantic's proximate damages arising out of the Indemnitor's failure to indemnify Atlantic are ongoing and continue to rise.

132.    As a result, based on the Indemnitor's breach of the Indemnity Agreement, Atlantic has been immediately and directly damaged in an amount to be determined, and Atlantic is entitled to recover that amount from the Indemnitor, including its counsel fees incurred in this action, together with any additional damages, losses and costs Atlantic incurs as a result of issuing the Bonds and pre-judgment interest.

## COUNT II
### Specific Performance of the Indemnity Agreement

133.     Atlantic adopts, incorporates, and re-alleges paragraphs 1 through 132 above as though fully set forth herein as this paragraph 133 of Count II of Atlantic's Complaint.

134.     As set forth above, the Indemnity Agreement requires that the Indemnitor shall hold harmless, indemnify and keep indemnified Atlantic "from and against any and all liability for losses, fees, costs and expenses of any kind or nature, including but not limited to, court costs, attorney's fees, accounting and any other outside consulting fees and from and against any such losses and expenses which the Surety may sustain or incur, plus interest thereon, arising out of, directly or indirectly: 1) the Surety being requested by the Indemnitors to execute or procure the execution of any Bonds; or 2) the Surety having executed or procured the execution of any Bonds on behalf of the Principal; or 3) the failure of the Indemnitors to perform or comply with any of the terms and conditions of this Agreement and/or 4) the Surety enforcing any of the terms and conditions of this Agreement." *See* **Ex. B** at ¶ 2-3.

135.     After obtaining knowledge of the DEQ's scrutiny of the reclamation efforts at East Decker including, among other things, the DEQ's Notice of Noncompliance (**Ex. I**) and Notice of Violation (**Ex. J**) which evidence a failure by Lighthouse and East Decker to comply with applicable law and a breach of the Operative Agreements, Atlantic has made its renewed demand on the Indemnitor to advance collateral security funds to Atlantic to protect Atlantic from its potential loss on the Bonds. *See* **Ex. R**.

136.     To date, the Indemnitor has neither posted collateral security with Atlantic nor advanced any funds whatsoever to Atlantic relating to Atlantic's liability and losses arising out of Atlantic's issuance of the Bonds.

137.     Atlantic's remedy at law is inadequate, and if the Indemnitor is not compelled to perform its obligations under the Indemnity Agreement, the Indemnitor may transfer or dissipate all of its assets in an attempt to avoid its obligations under the Indemnity Agreement.

138.     Atlantic will suffer irreparable harm if the relief sought in this Complaint, which is consistent with Atlantic's rights under the Indemnity Agreement, is not granted.

139.     As a result, Atlantic is entitled to an order of specific performance requiring the Indemnitor to perform its obligations under the Indemnity Agreement to provide Atlantic with funds, as collateral, in the amount of $25,125,000.00 to protect Atlantic from potential loss.

140.     Atlantic has not previously brought an action to recover the relief sought herein.

### COUNT III
### Exoneration and *Quia Timet*

141.     Atlantic adopts, incorporates, and re-alleges paragraphs 1 through 140 above as though fully set forth herein as this paragraph 141 of Count III of Atlantic's Complaint.

142.     The Indemnity Agreement requires the Indemnitor to advance funds or other security to Atlantic upon demand from Atlantic sufficient to be applied to any obligations of the Indemnitor under the Indemnity Agreement.

143.     On or about October 29, 2025, Atlantic requested, in writing, that the Indemnitor indemnify Atlantic and advance funds to Atlantic in the amount of $25,125,000.00 pursuant to the Indemnity Agreement.  This amount has and will continue to increase as Atlantic has and continues to incur fees and expenses in enforcing Atlantic's rights under the Indemnity Agreement.

144.     As the principal on the Bonds, Black Butte owes Atlantic the duty of exoneration requiring Black Butte to perform its obligations before Atlantic is called upon to perform its obligations under the Bonds and in relation to the Indemnity Agreement.

145.    Atlantic is entitled to a remedy known as quia timet.  This remedy secures a surety from loss when it appears that the principal is reasonably likely to fail or refuse to perform or to protect the surety from loss.

146.    The Indemnitor has failed and refused to meet its obligations under the Indemnity Agreement by failing to indemnify Atlantic for any and all losses and liability asserted against it on account of Atlantic having issued the Bonds, as set forth in the Indemnity Agreement, and by failing to post collateral to Atlantic to cover penal sum exposure faced by Atlantic.

147.    Atlantic has already suffered losses and incurred costs in relation to the Bonds and will continue suffering such losses and incurring such costs in relation to the Bonds.

148.    Pursuant to the Indemnity Agreement, Black Butte is obligated to (a) provide collateral to Atlantic, and (b) reimburse Atlantic for any losses and/or costs incurred in relation to the Bonds.

149.    Atlantic is entitled to be reimbursed for the attorneys' fees and costs it has currently paid and to be fully collateralized by the Indemnitor for its potential liability in order to discharge its obligations under the Bonds.

150.    Atlantic lacks an adequate remedy at law to secure its right of exoneration from the Indemnitor and is without a plain, speedy remedy at law, and will be irreparably and permanently injured unless this Court grants the equitable relief requested herein.

151.    Atlantic has not previously brought an action to recover the relief sought herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Atlantic Specialty Insurance Company respectfully requests judgment as follows:

1.      On Count I, judgment against defendant, Black Butte Coal Company, in an amount to be determined based on the Indemnitor's breach of the Indemnity Agreement, together with any additional damages, losses and costs incurred by Atlantic, pre-judgment interest and Atlantic's costs and expenses, including counsel fees, incurred in enforcing the terms and conditions of the Indemnity Agreement and in bringing this action;

2.      On Count II, an order (i) requiring defendant, Black Butte Coal Company, to specifically perform its contractual obligation to deposit with Atlantic funds by way of money or other guaranties determined by Atlantic to be sufficient to cover the actual and anticipated obligations and exposure arising out of the Bonds, in an amount to be determined at trial, but to date, reasonably estimated to be at least **$25,125,000.00**, or in the alternative, an order to deposit such funds for such purpose in the registry of the Court; and (ii) enjoining and restraining the Indemnitor from selling, transferring, or otherwise disposing of or liening its assets and property which may be used to satisfy their obligations to Atlantic under the Indemnity Agreement unless and until Atlantic shall receive the funds as prayed for in paragraph (a) above, or as later amended due to pending and potential additional claims against the Bonds, and all debts and liabilities under the Bonds and the Indemnity Agreement have been discharged;

3.      On Count III, ordering specific performance of the Indemnity Agreement thereby ordering defendant, Black Butte Coal Company, to indemnify and exonerate Atlantic for all loss incurred by Atlantic as a result of Atlantic having executed the Bonds and in enforcing the terms of the Indemnity Agreement including specific performance of the collateral obligations set forth herein; and

4.      On all Counts, judgment against defendant, Black Butte Coal Company, for any additional relief the Court deems appropriate, including costs of court and counsel fees.

Respectfully submitted,

Dated: November 17, 2025

**WESTERMANN SHEEHY SAMAAN
& GILLESPIE, LLP**

_____s/Michael J. Rosenthal_____
Michael J. Rosenthal, Esq.
90 Merrick Avenue, Suite 802
East Meadow, New York 11554
Telephone: (516) 794-7500
Fax: (516) 794-1277
Email: michaelrosenthal@westerlaw.com

**WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.**
John E. Sebastian, Esq. (to be admitted *pro hac vice*)
Brian C. Padove, Esq. (to be admitted *pro hac vice*)
10 South Wacker Drive, Suite 1100
Chicago, Illinois 60606
Telephone: (312) 219-6900
Email: jsebastian@watttieder.com
          bpadove@watttieder.com
*Counsel to Atlantic Specialty Insurance Company*